My name is Peter Nordberg and I am here today representing plaintiffs in the Ileto v. Glock matter. We are here today on review, as you know, of an order from the District Court granting a motion to dismiss for failure to state a claim. I can't hear you. Can you speak up a little louder? My apologies. Can you hear me a little better now? Yes. As I say, we are here today, as you know, on review of an opinion below dismissing the plaintiff's claims for failure to state a claim under Rule 12b-6. This case arises from a set of hate crimes committed on August 10, 1999 that have received a fair amount of publicity and which were discussed in the briefs and with which I am sure the Court is familiar. Plaintiffs have sued the manufacturers of the handguns found in the possession or used by the perpetrator of the shootings in question. A man named Buford Furrow, who assembled an arsenal of firearms, went to a Jewish community center day camp in Granada Hills, California, entered, went on a shooting spree, shot and severely injured several children, shot at several more. Some of those children are themselves or through their guardians plaintiffs in the lawsuit. After that, Mr. Furrow left the Jewish community center, drove around the area, saw a Filipino postal worker, Mr. Joseph Aleto, on his rounds, shot and killed him. So which legal theory would you like to discuss for us today? We have two. And the good news, Your Honors, is that we have pruned this case from much debris. At this point, we had originally pleaded claims for injunctive relief. We had originally pleaded class allegations. We had originally pleaded unfair business practice allegations. But the legal theories in this case are now two. And I'll discuss whichever one you'd like first. Let's start with the negligence claim. Very well, Your Honor. I will say that the operative legal facts as pleaded in the complaint that would establish liability under either theory are essentially the same. And it's helpful to say what neither theory is. Neither theory is a strict products liability theory. So on neither theory do plaintiffs maintain that a handgun manufacturer or distributor is strictly liable in court if the client is handgun-injured in a shooting. Nor is it claimed that these products were defectively manufactured or functioned as intended. Nor is it claimed that they were defectively designed in the sense that they shouldn't have been sold to the public at all on the theory that the risk of harm they pose outweighs their social utility. This lawsuit is not about the design of the guns or the manufacture of the guns. It's about the marketing practices adopted by defendants in distributing the guns. And in particular, the circumstance that defendants know or should know that various distributors and dealers to whom they sell feed the criminal market. This is not a lawsuit that could have been brought 10 years ago because we wouldn't have known that. But about in the 90s, the Bureau of Alcohol, Tobacco, and Firearms began tracing weapons used in crime. Received wisdom used to be that weapons used in crime were commonly stolen. This turns out not to be true. They are sold through regular distribution channels that Buford-Furrow brought them through. And the ATF data also revealed that 1% of all dealers in the United States are responsible for the sale of 50%, half, of all guns used in crime. How do you get out from under the dissent in Merrill? I mean, isn't your argument the same as the dissent in Merrill? I think, Your Honor, that what I would probably have to get out from under is the majority opinion in Merrill. So the dissent didn't prevail. And your argument's the same as the dissent, put it any way you want. Well, with respect, Your Honor, I think the argument is not the same. Because the plaintiffs in Merrill sought damages on a risk-utility theory. On the theory that the weapon in question should not have been sold to the general public at all because its risks outweighed its social benefits. That is precisely the kind of claim that is proscribed or was proscribed prior to its repeal by Section 1714.4 of the California Civil Code. And all the plaintiffs did in Merrill was relabel their theory. Their theory was not about the conduct, the marketing or sales conduct or distribution habits of the defendants. It was not about the negligent furnishing of weapons. It was not about the carelessness of the sales practices or the recklessness of the sales practices. In short, it was not about defendants' conduct. It was about the guns. And Merrill held that the mere relabeling of the cause of action didn't change the fact that it was a product's liability action. But was careful to distinguish claims based on negligent furnishing, which it called very different and which, frankly, are the gravermen of the cause of action here. There are a host of largely unregulated sales avenues through which criminals gain access to guns, at gun shows, through straw purchases, through multiple sales, et cetera. All of these are detailed in the complaint. The manufacturers and distributors know or should know which dealers, which distributors are a problem. They should know that for the same reason that the ATF knows it. When the ATF does a crime trace, when a gun has been used in a crime, the Bureau of Alcohol, Tobacco and Firearms contacts the manufacturer with a model and the serial number of the gun. So at that point, the manufacturer is on notice that that gun has been used in a crime. And it asks the manufacturer, to what distributor did you sell that gun? ATF then goes to the next person down the sales chain and so forth and so on and tries to trace all the sales of the gun, just as the manufacturer can once on notice that its guns have been used in a crime. So given that the manufacturers have access to knowledge about which distributors pose a problem, which retailers pose a problem, which people are catering to the criminal market, catering to multiple sales, catering to straw purchases, it is within their power to alter their conduct, to shut down those lines of distribution to exact conditions, in other words, to monitor and control to whom they sell the guns. On a negligence theory in California under Section 302, which California follows, of the Second Restatement, the reasonably foreseeable misconduct of others does not insulate defendants from liability. Worth reading on that point is the Selma Pressure Decision, a public nuisance decision cited in our briefs. But ---- What significance do we attach here of the repeal of 17, 14.4 and the revision to 17? I think 17 ---- 14. I think the 17. 714.4 never had anything to do with this case. Well, the district court was careful to distinguish this case from ---- From Merrill v. Smith. From Merrill. Correct. But then the district court said, well, you know, we've got to take a look. There's some public policy statement that's reflected in 17, 14.4. Well, exactly, Your Honor. We have to be sensitive to. So I'm asking you, how does that play out today? Well, here's what I think happened. I think that you started prior to the enactment of 17, 14.4 with a general enunciation in California that people are responsible for the foreseeable consequences of their actions. General negligence principle. No hint in the statute that anyone was immune from liability. Then the legislature passed a narrow exception, 17, 14.4, barring only lawsuits proceeding on a product's liability theory and indeed only product's liability lawsuits proceeding on the theory I just described and supplying a special definition of causation for only those lawsuits. The court in Merrill v. Navigron never went beyond that. It held that section 17, 14.4 literally applied to the product's liability case proceeding on precisely such a theory before it. So I think the district court correctly held that this case never fell within section 17, 14.4 and, as you say, instead decided to read into section 17, 14.4 a broad state public policy. But I think the answer to that is that no decision from California supports that broad immunity, that broad public policy to exempt handgun manufacturers from liability that the district court found. The language of section 17, 14.4 could have been crafted to confer such a general immunity but was not. Indeed, the legislature has now repealed section 17, 14.4 and has added a clarificatory statement to the general statement of liability principles under Civil Code 17, 14, clarifying if it needs to be clarified, as apparently it does, that gun manufacturers are not, in fact, exempt. In short, I think, Your Honor, the district court took a narrow exception and read into it an overbroad public policy where none exists or ever has existed. So that would be my answer to your question. And what the legislative response makes clear is that it always has been the public policy of the State to permit liability for the foreseeable consequences of your own reasonable actions. Roberts. Dependents say that that's just a backdoor way of arguing some sort of retroactivity or retrospective application to this case. Retroactivity has nothing to do with it. The district court correctly held that the statute was never applicable. And I think it's our position that it never was applicable and that the district court erred in reading into it any supposed public policy. Take the points one at a time. The statute never applied. The district court correctly held that it didn't apply. Even defendants now largely seem to be saying that it never applied. As a matter of public policy. I mean, the question boils down to really was it a clarifying amendment or was it a substantive change in the law, right? There are two amendments. There's the amendment to 1714, which in a way is irrelevant because the whole statute doesn't apply. Then there's the amendment to the general provision about liability under California law. And I think the arguments that is clarificatory are these. That there have been other suits in California involving guns that have not been dismissed on the simple theory that gun manufacturers are immune from suit. That the language was general and conferred general liability on people who engage in negligent conduct causing harm. And the language of the amendment just clarifies that it uses the language that gun manufacturers are not exempt from this general principle. Again, if there had ever been a public policy in California to exempt manufacturers or distributors of handguns from liability, it would have been easy to write very straightforward language. Other states have done it. And it might provide that no manufacturer or distributor of a handgun shall be liable in any suit by a municipality or a shooting victim, et cetera, et cetera. We could sit here right here right now and write that statute. But it was never written, and that's because there was never the political will to write it. So. How about your nuisance claim? Well, the public nuisance claim is based on the same set of operative facts. There is a host of arguments that defendants have thrown up against the public nuisance claim. But it might be simplest to just talk about why it fits. A public nuisance involves a set of facts that poses harm to some common interest of the public. It must be a substantial and unreasonable interference with the public right. Among the public rights of interest are the right to public health, safety, welfare, and peace. If defendants have even ever contended that the widespread prevalence of easy access to handguns among criminals and youth does not constitute a public nuisance, it's certainly not a point they've emphasized, and it's not a theory on which they move to dismiss. Defendants' answer to the public nuisance claim has been either to invoke various technical doctrines that supposedly bar a public nuisance claim not involving real property or a public nuisance claim in areas where the legislature has expressly authorized conduct. In short, they're not the basis adopted by the court below for rejecting the public nuisance claim. And I'd be happy to talk about why those separate arguments by defendants, in our view, were unmeritorious. The court below seems to have relied, again, on the supposed policy found in Section 1714.48 that the shooter, not the manufacturer, is liable, an exception that only applied even during the life of that section to the kinds of claims it covered, i.e. not this one. And it, I think, also seems to have relied on concepts of foreseeability. And it's, in places, maybe a little unclear in the district court's decision what's being discussed under the rubric of public nuisance and what's being discussed in terms of negligence, but there is, I think, common to the court's decision on both points, the sense that the manufacturers couldn't foresee that Buford Furrow would obtain these weapons in the way he did from these dealers and shoot these people. Now, with all respect to the district court, the test for negligence, anyway, under California law, under cases like the Ballard decision, under cases like Warren v. RKO, is whether the defendant's conduct creates a risk of the type of harm that injures plaintiffs. And so no one thinks that defendants could have foreseen anything about Buford Furrow in particular or had ever heard of Buford Furrow. No one thinks that defendants could have foreseen anything about Joseph Aledo or the other plaintiffs or had ever heard of them, but that's not what defines the scope of their duty. What defines the scope of their duty is the foreseeability of the kind of harm. If you're in the business of selling handguns through distribution channels that favor reckless methods of distributing handguns to criminals and youth, and if people are shot as a result, that, to me, is close to being foreseeable as a matter of law,  the kind of harm, frankly, that we're looking at here is very foreseeable. For a California law case on point, Warren v. RKO, disc jockey holds a contest, radio station holds a contest, invites people to locate him on the streets of the city of Los Angeles. Car chases ensue. There is reckless motorist activity. A crash results. A third party is injured. They sue the radio station for conducting this contest. The radio station, of course, says, well, we are entitled to presume that motorists will behave lawfully, and moreover, we could not have foreseen this harm, and moreover, we are without the power to control the behavior of others. None of those arguments flew. The court held that the kind of conduct that resulted from the behavior of the radio station was precisely foreseeable, that the illegality or impropriety of the motorist conduct did not shield the radio station from liability, and that it was responsible for the foreseeable consequences of its conduct. That, we submit, should also be the result here. Public nuisance is an interesting doctrine to apply in some ways because it's a traditional doctrine being applied to a somewhat novel fact pattern, and one of defendants' main arguments against it is that only historically traditional public nuisance fact patterns should be recognized. So they seem to concede that there are some valid ones. One example that I particularly like that defendants have floated is the maintenance of a pond where malarial mosquitoes might breed. This is an example, again, of something I think China North has said might pose or has posed a legitimate cause of action. Well, I suppose the owner of the pond doesn't know of any particular mosquito, whether it is malarial. I suppose the owner of the pond can't foresee of any particular mosquito that it will leave the pond and fly to its neighbor's house, perhaps beyond its neighbor's house, somewhere far away, and sting. But if we resist requiring the plaintiff in the malarial pond suit to plead the particular mosquitoes or to foresee the particular mosquitoes with particularity, it is because of our sense that the owner of the pond knew very well that it was likely that if he was feeding this malarial population of mosquitoes, they would go forth and sting and injure citizens in the area. And if you could tag the mosquito to the pond, maybe there might be a lawsuit. You have just a few seconds left. You just have a few seconds left. Do you want to reserve those? So in sum, I think the claims are viable under both the negligence and the public nuisance theory. I want to emphasize, again, we have been dismissed at the pleading stage. There is no requirement that we plead any of this with as much particularity as we have. To be dismissed on causation grounds at the pleading stage seems especially unusual. And, you know, when a factual record is developed or a prior fact appears, some of the arguments the defendants have been raising may have some appeal to that prior fact, but there should be one. Thank you, counsel. Thank you, Your Honor. Do you have a time agreement? Good morning, Your Honors. With regard to the time agreement, I will probably be taking about 10 or 12 minutes somewhere in that area, depending upon the court's questioning also, and then I will defer to some co-counsel here. My name is Christopher Inzulli, and I'm pleased to be here today. I represent Glock, Inc., as well as RSR Management Corporation and RSR Group, Nevada, Inc., in this appeal. I thought I would begin by pointing out to the court some of the facts, the facts that were alleged in the First Amendment complaint in this case, as well as point out to the court where facts were noticeably missing from the First Amendment complaint, because I think those facts that are missing clearly show why the district court reached a proper conclusion. Now, it's a fact that Mr. Furrow is a murderer, and he is serving multiple life sentences for his intentional criminal conduct on that day, but Buford Furrow, however, who is the true tortfeasor in this case, he's not here. He's not in this case. He wasn't named as a defendant. Now, the plaintiffs in the First Amendment complaint, they concede that Furrow only shot one firearm when he was at the JCC. He didn't discharge the Glock pistol, or he didn't discharge the Maddy rifles, or the two Imbel rifles, or the Davis handguns, you know, most of the other defendants named in this case. Moreover, in the First Amendment complaint, it's only alleged that Mr. Furrow used the Glock pistol when he criminally murdered Mr. Oleto. Now, surely there's no claims against the other manufacturers whose firearms Mr. Furrow never even used. I mean, the court made the right ruling down below. Those folks shouldn't even be in this case. Although all of these manufacturers have been sued, Buford Furrow is not here. Also, all of the distributors and the retailers and all the middlemen that may have, may have sold these firearms to any other folks, they're not in this case either. We only have the manufacturers, and we do have one distributor, and I'll get to that in a minute. What's the significance of the fact that they haven't alleged the other middlemen? Why do you point that out? What am I to take from that? The reason why I point that out, Your Honor, is because the plaintiffs have alleged a number of terms to try and get their point across. And some of that is multiple sales and straw purchases and traces and all of these issues. But there's no claim in the complaint that any one of the defendants actually engaged in any of these things. Now, multiple sales are legal. Straw purchases, multiple sales are legal. I'm sorry if I wasn't clear on that. It's legal to buy more than one gun in most jurisdictions. Straw purchases are illegal. A retailer will go to jail if it's determined that the retailer knew that a straw purchase was being conducted. So the fact that none of these middlemen are in this case is very interesting. And that's because the plaintiffs have no facts to show that the manufacturers did anything wrong or violated any statutes or should be held liable for selling to any one of these amorphous distributors, retailers, that they allude to. They're not here. Where are they? If gloss people don't know. It's still at the pleading stage. As the lawsuit progresses, parties are added and parties are dropped and claims are changed. It's a dynamic. It doesn't remain static at all. I agree. And I just want to point out two things with that, Your Honor. Number one is they put together, the plaintiffs put together a 40-page complaint. And it was down in the state court. They were given an opportunity to amend their complaint, to try and come up with claims that would satisfy California law. So we've gone through two complaints. And the plaintiffs still don't have facts to tell, to put us on notice that here are the distributors, here are the retailers that we say are bad distributors, bad retailers. And you shouldn't have sold that gun to them because they in turn sold it to another person who sold it to another person and somehow Mr. Furrow got a hold of it. My second point was there is one manufacturer where you do get a hold of it. All right. So do you concede if they pled that it was a viable claim? I certainly do not. Okay. Isn't that what this is all about right now? I mean, let's assume for the moment they had pled all that. Tell me why that claim is not viable because it seems to me that's the crux of the argument here today because you're trying to throw them out on a 12B6. Right. We know what the pleadings are. We know who's not here. Let's get to the chase. The Glock system was sold to a law enforcement agency. What was Glock to do? How were they to monitor the Cosmopolis Police Department? No, I think the idea here, and then you can explain to me why this theory doesn't work. We know California hasn't opined one way or the other on this, so we're dealing with a blank slate. Merrill arguments aside. Let me take a very absurd example. Let's say that a manufacturer put out an advertisement saying, having trouble obtaining a weapon, are you a criminal? Similar to the ones you have in you can't get credit. Come to us. We will make arrangements for you to get the weapon. And let's say someone follows that chain and then a crime is committed. Does that state a cause of action, do you think? Is that viable? Reading between the lines of Your Honor, I believe you say that the conduct of the manufacturer was illegal. No, I just said the manufacturer is saying having trouble getting a weapon, trouble, you know. Let's say it's a legitimate advertisement, but the aim of the audience is perhaps an illegal audience. Are they liable for that? Is there a theory? Under what theories? Under a public nuisance theory? None of those theories are stated today. Under a negligence theory? Under a negligence theory. Let's take the negligence theory. I don't think the manufacturer is doing anything illegal. I would probably need more facts to develop that argument. That's a hypothetical. I've thought about it before today. Yeah, go ahead. But it's clear in this complaint anyway that they say that none of the conduct of any of the defendants was illegal. No. What they say, yeah, that's true. But what they say is that you engaged in conduct creating a risk of harm. And, you know, negligence doesn't, negligence theory is dependent upon illegal conduct. But we don't know what the conduct is. The conduct is that we shouldn't be selling to certain amorphous people who are not here. Why shouldn't we sell to them? Well, perhaps some of them break the law. Well, you know, Chrysler, you shouldn't be selling to your distributors either because, you know, they sell to people who drink and drive, and people can get hurt by folks who are drinking and driving. It's putting too much of a duty upon the manufacturers. It's going past what the California law provides. So with regard to the negligence claims, the district court was right in properly dismissing the negligence claims. There's no duty here that extends to Glock or RSR or any of the other manufacturers. The court, we haven't addressed the Roland versus Christian factors, and I think that was important to the district court below. And the district court looked at the first two of the seven factors, and one was foreseeability of harm to the plaintiff, and then there's the closeness of the connection between the defendant's conduct and the plaintiff's injury. Well, take one of the defendants. Take Glock, for example. They sold a gun to a law enforcement agency in Washington. Now, what was their duty after that? Were they supposed to monitor the Cosmopolis Police Department and say, hey, if you guys don't like the guns in the future, you make sure you call us up, and we're going to tell you where you can sell that gun. Imagine the phone call that we would get back from Cosmopolis Police Department. To extend the duty this far, it just violates California law. There's no court in California that has found a duty to go that far. It's short. Is it foreseeable that criminals are going to use Glock pistols and the other firearms manufacturers use their pistols or their firearms to commit crimes? Absolutely. There's no doubt about it. But there's no way that we can see that Glock could foresee that Mr. Furrow was going to use this pistol against these plaintiffs when they sold the gun to a police department and there were no less than four or five transactions afterwards, over three and a half years before it came into the hands of Mr. Furrow, and then he used it to commit an attack. There's just no way to foresee that. And I think California law, it shows this duty is not applied to the manufacturers to protect or ensure against the misuse of their non-defective firearms. We're not dealing with defective firearms. We're dealing with firearms that worked. And I think the case law is pretty clear on that. I would like to point the court, I know the court has read all the papers, but the Hamilton decision in New York I think is very critical and I think it highlights a lot of the points that we hear today. That case was addressed by New York State's highest state court, the Court of Appeals, the court is well aware of that, as well as the Second Circuit. And in that case, those were criminal shootings also. And a little quote from that court, the connection between the defendants, the criminal wrongdoers, and the plaintiffs is remote, running through several links in a chain. Those links aren't here today. Several links in a chain consisting of at least the manufacturer, the federally licensed distributor or wholesaler, and the first retailer. The chain most often includes numerous subsequent purchasers, as alleged in the complaint with regard to Glock, or even a thief. The court refused to find a duty in tort. Roberts. No, go ahead. Finish your comment. I'm sorry. Where there is no tangible showing that the defendants were a direct link in the causal chain. Right. But that was a summary judgment. That was a summary judgment case. It actually was, it actually wasn't a summary judgment case. The case went to trial before Judge Jack Weinstein. It went up on appeal to the Second Circuit. The Second Circuit referred the question of law to the New York Court of Appeals. The New York Court of Appeals found there is no duty upon a manufacturer to control downstream distribution of their product. My point is that it had undisputed facts in it. It wasn't a 12B6 dismissal. Your Honor, that was before Judge Weinstein.  It was in New York, and as you may or may not know, there was just another case that just went to trial also brought by the NAACP. So this is a Jack Weinstein, a Judge Jack Weinstein case. I'm sure the Court is well aware of those cases. But the point is still the same. The issues of law that the New York State, the highest court in New York State, decided should be applied here, could be applied here. And we ask that it is. Let me just ask you one question. It's just a thought that occurred. If I'm not mistaken, the Second Circuit certified the question, the legal question, to the Court of Appeal of New York. Is that something we should consider here? Certainly, Your Honor. I think that there's enough case law here that you can make an informed decision that the plaintiffs have failed to state a cause of action. You don't see any need for that. Honestly, if there's nothing directly on point, and Your Honor brought that up when we first started, there is nothing directly on point. I think, though, that there is enough case law that we've cited throughout our briefs where you wouldn't have to refer it. If the Court is hesitant, I would refer it, and that's your right. And certainly we would not object to that. Okay. Do you want to save some time for the rest of your colleagues? I certainly do. Okay. I don't want to detray you from making any points you want to make, but they're looking anxious over there. I'm sure it's about 1714. If they're going to address it, then that's fine. I will address it. I will address it quickly, and then I will refer. Split it any way you want to. 1714, I agree with my adversary here that the Court below did not really rely upon 1714. She did refer to it often. She specifically came out and said 1714 did not, by its terms, bar the negligence action. If this Court looks at this complaint and determines, maybe as the Merrill Court did, that this is really a product liability case in disguise, I think is the language they used, well, then 1714 would apply. And 1714 was the law of the land at the time of the motions below, at the time of the incident. At the time that the plaintiffs filed their appeal, it was the law. And certainly the changes to the law are not retroactive, and I don't think there's an issue on that. But do I think that this is a product liability claim? I think that the plaintiffs in this case have tried to plead around that and say it's not a product liability claim. So I think 1714 is just a red herring. I don't think the Court below relied upon it to the detriment of her decision. I think she looked at sound California law. She looked at the rolling factors. Can we view the change to 1714 just as a clarifying sort of amendment? If the Court does not view this case as one of product liability, I don't think that the Court would view it in any way. I don't think it's relevant. If the Court finds that this is a product liability case, then that would be a different story. I think that there's sound California case law on point with which the Court can find that the lower court was correct in dismissing this at the 12b6 stage. There's enough facts alleged in that complaint where it can be dismissed at this stage. Thank you. I'll defer to co-counsel at this point. May it please the Court. Good morning, Your Honors. My name is Dan Dick, and I represent Quality Parts Company, sued here at Bushmaster Firearms, one of those manufacturers whose weapon was never used because we are chambered in a rifle. I kept hearing handgun rifle for a .225 caliber, which is too small to fit the 9mm bullet, which was found at both shooting scenes. I heard counsel talk about the fact that there were, and the Court is concerned about the fact that this is at the 12b6 stage, and may we uphold dismissal here. Have we found this on something other than a statutory grounds? Have we found it on good California policy? Your Honor, I believe that regardless of Merrill and how you look at the statutes, yes, we do. And you need not even look at those issues because beginning with the Stanley case in 1954, when a car is in San Francisco with the keys left in, someone rips off the car and decides to crash and injure someone. We have not held someone liable for the criminal acts of another. And those follow through the firearms cases, as I call them. The Todd case with the shootings of the cousin by the parent's gun. The Jacobs matter, since this Court was concerned about the 12b6 section, I would point this Court that insofar as Big Five, the seller of the firearm, is concerned, they were granted motion for judgment on the pleadings, which is the California equivalent of a demurrer after the complaint has been answered, and therefore it's your second shot at the state equivalent of a 12b6 motion, because the distributor there, Big Five, could not foresee that person taking that gun home and shooting these people, or shooting himself primarily. I also heard counsel talk about his concerns about how we have addressed his arguments insofar as public nuisance. Your Honor, we took counsel's own cases and demonstrated that in every case in which California has recognized a public nuisance, there's been a tie to the land. Not my cases. Counsel's own cases. Businesses, such as roller rinks or bars, which cause problems in the neighborhood, either traffic problems or on the sidewalks. Dilapidated buildings that cause fire concerns to neighbors. Pestilences in orchards that cause problems for neighboring farmers. All of these, derived from Avalanche cases, are where we come out with the idea that if you're going to state public nuisance, there's a tie to the land somehow in traditional public nuisance. And to go beyond that, Your Honor, is to go far beyond the bounds of any public nuisance that's been recognized in California, particularly in regard to Bushmaster, since we don't sell in California. We don't sell to the public. We do sell to the highway patrol and to law enforcement, but we do not sell to the public. And, Your Honor, I would put it to you that if this Court were to continence allowing these claims to go forward, it would put itself out of step with other sister circuits who have considered this. I would put to you the Second Circuit that my brother from New York has spoken to you about. I would put to you the Third Circuit twice, under New Jersey law and under Pennsylvania law, have twice rejected such claims. Basically they have. Have they opined on California law and other circuits yet? Excuse me? Have they opined on California law and other circuits? No, sir. I mean, this is really a state law question. It is a state law question, Your Honor. It is a state law question. There's been comment here about how it is foreseeable for the defendants to have seen this coming down the pipe. Once again, answered by our California Supreme Court in 1989, Thing v. Lachuse, a little Johnny Thing playing in the street gets hit by the car. His mother doesn't see it. His mother doesn't hear it. But she comes running and sees her child lying there in a pool of blood. Is it foreseeable that she will be distressed? Absolutely. But as far as our Supreme Court said, you know, there are courts that can foresee endlessly for days, but there is no basis thereupon for either a socially or judicial boundary upon tort claims. And they were deciding what would be in the tort of negligent infliction of emotional distress. Your Honor, one of the examples I put is will we allow suits against Louisville Slugger because someone takes a baseball bat instead of hitting home runs, decides to commit mayhem? I think not, and I think not here, Your Honor. I would love to address questions, but I find myself running out of time. I'd like to reserve the rest of my time for my brethren from San Diego. Thank you. Good morning, Your Honor. Always hazardous being the last one on. I better keep reading the talk quickly. Colin Murray from Baker and McKenzie in San Diego on behalf of China North Industries. The Court has recognized that this is a question of California law, and it's worthy of pointing out that no California court to date has ever recognized a public nuisance cause of action based on the lawful sale of a non-defective product. And that's precisely what the appellant is asking this Court to recognize today. It struck me in the beginning of Mr. Nordberg's comments that he mentioned that this case is not about design. It's not about manufacture. It's about distribution. Well, my client is not a distributor of firearms. My client, China North Industries, is a manufacturer of firearms located in China. The appellant has failed to allege any ultimate facts with respect to the importation of the firearm manufactured by China North, with respect to the final point of sale from a retailer, with respect to any successive owners. Judge Paez asked the question, well, why are the links in the chain important? And the response I would submit to this Court, both in the context of negligence and also in the context of public nuisances, there needs to be some modicum of foreseeability, which can't possibly be present from the vantage point of my client in Beijing. Thank you very much. Thank you. Very succinct and well presented. Several points, Your Honor, briefly. There's been talk that Buford Froh did not use certain of the weapons. I believe what defendants may mean by that is that shell casings from some of the weapons were recovered. He may not have fired all the weapons. He had an arsenal at his disposal as he was terrorizing the community. I don't know that there's any factual record about what weapons he may have brandished or threatened people with. Question of fact. There's been talk about the lengthy chain that these products go through before they reach the ultimate consumer, in this case Mr. Furrow. Question of fact. The discussion of the other decisions where there was judicial talk of retailers and wholesalers and distributors and seven steps after a factual record had been developed. So it's a prioristic speculation here to imagine a longer or short chain. We know that in one case, Davis Industries, the dealer to whom the weapon was sold was Buford R. Furrow, not very remote. 821B, Restatement of Courts, Comment I. I'm sorry, Comment H. Section 821B, Restatement of Courts. Land or interference with the use of enjoyment of land has nothing to do with a public nuisance claim. Certification. We brought these claims in state court. We were removed. This court has to do its best job at predicting California law. Were this court to conclude that it was reluctant to climb out on a limb, well, what this court has to do is climb out on the same limbs that the California Supreme Court would. And if you need the California Supreme Court's help in predicting that, as I say, we brought these claims in state court. It's their limbs, not ours, that we have to predict. Finally, Your Honor, there's been talk about how Buford Furrow is the true tort freezer here. Two things had to come together for these shootings to happen, Buford Furrow and some weapons. California follows the substantial factor test for causation. The question is whether defendant's negligent conduct was a substantial contributing factor bringing those things together and causing the harm. Thank you. I've given you a little extra time. And I thank you all for your presentations. I know you had a lot more to say, but we have a very excellent brief, and the matter will be submitted. Thank you all for your audience.
judges: Hall, Thomas, Paez